UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
In re:

       Neil's Mazel, Inc.,

           Debtor.

-------------------------------------------------------X

Chapter 11 (closed)

Case No. 00-22010-dte

## MEMORANDUM DECISION AND ORDER

*Appearances:*

Posr. A. Posr.; Ronald "Golden Eagle" Roberts
*Representatives of movant Western Mohegan Tribe and Nation of New York*
703 N. Orange St. # 204
Wilmington, DE 19801

Nachamie, Spizz, Cohen & Serchuk, P.C., f/k/a Todtman, Nachamie, Spizz, & Johns, P.C.
*Attorneys for themselves and alleged contemnor Barton Nachamie, Esq.*
425 Park Ave.
New York, NY 10022
By: Barton Nachamie, Esq.; Jill Makower, Esq.

Maynard, O'Connor, Smith & Catalinotto, LLP
*Attorneys for creditor Ulster County (New York) Department of Finance*
6 Tower Place
Albany, NY 12203
By: Justin W. Gray, Esq.

Hiscock & Barclay, LLP
*Attorneys for alleged contemnors M. David Graubard and Kera & Graubard*
80 State St.
Albany, NY 12207
By: David B. Cabaniss, Esq.

Honorable Dorothy T. Eisenberg, United States Bankruptcy Judge

## Introduction

Western Mohegan Tribe and Nation of New York ("Western") seeks an order reopening this closed bankruptcy case, for the purpose of holding certain parties in contempt and obtaining various other forms of relief. Western has already made one prior motion to reopen this case, which this Court denied by order entered on December 4, 2012. Undeterred, Western has filed the motion which is currently before the Court, asking that this Court, among other things, vacate that order and reopen the case so that Western may obtain the relief it seeks. For the reasons set forth below, the motion before the Court is DENIED in all respects.

## Background

Western is a group of individuals purporting to be an Indian tribe, and the Court has no knowledge of any facts to deny that they may be an Indian tribe. Nevertheless, Western has not attained formal, federal acknowledgment as an Indian tribe by the Bureau of Indian Affairs ("BIA") or by any federal court, despite having sought such recognition in multiple courts (including this Court) and from the BIA. Such recognition would confer substantial tax and other benefits. *See BGA, LLC et. al. v. Ulster County*, 2010 U.S. Dist. LEXIS 86875 at *25 (N.D.N.Y., Aug. 24, 2010). Ronald "Golden Eagle" Roberts ("Chief Roberts") is the Chief and "Attorney General" for Western, though he is not admitted to practice law. Posr A. Posr is "Assistant Attorney General" for Western, and has been acting in effect as Western's attorney-at-law before this Court—even though he also is not a lawyer.

At the heart of this controversy is certain real property, located at or near 10 Tamarack Road, Greenfield Park, NY (the "Property"). In the year 2000, the Debtor and the County of Ulster of the State of New York ("Ulster County") were engaged in adversarial litigation over the Property, arising out of Ulster County's prior foreclosure of a tax lien. Ultimately, the Debtor

and Ulster County decided to sell their respective interests in the Property to Western, which sought to purchase the Property as both a home and place of business for its members.

On November 13, 2000, the Debtor filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code, for the primary purpose of facilitating a sale of clean title in the Property from Ulster County and the Debtor to Western. The Debtor's bankruptcy counsel was the law firm of Kera & Graubard ("Kera"). An individual named Ofer Bachar was President of the Debtor. The late Chief Judge Conrad B. Duberstein initially presided over this case.

Between December 12, 2000 and January 5, 2001, the Debtor and Ulster County each executed respective agreements with Western, whose combined import was that Western was to purchase the Property from Ulster County and the Debtor for a total of $1.85 million, $950,000 of which was to go to the Debtor, and $900,000 of which was to go to Ulster County.

On March 6, 2001, Judge Duberstein entered an Order (the "First Sale Approval Order") which, among other things, approved the foregoing sale of the Property to Western. The First Sale Approval Order contained the following decretal paragraph:

> [It is] ORDERED, that the closing and consummation of the [agreements between Western, the Debtor, and Ulster County]… shall have the effect of settling any and all claims that Ulster County and [the Debtor] have against each other… **all of which enable Ulster County and the [D]ebtor to transfer the [Property] to Western… free and clear of all title defects, liens, charges, and encumbrances**….

(Emphasis added).

In late June of 2001, Western retained the law firm of Todtman, Nachamie, Spizz, & Johns, P.C., now known as Nachamie, Spizz, Cohen & Serchuk, P.C. (the "Nachamie Firm"). Barton Nachamie, Esq., a partner at the Nachamie Firm, was lead counsel. Around the same time, Western entered into a development agreement with an entity called BGA, LLC ("BGA"),

which called for BGA to advance up to $3.3 million in order to assist Western with acquiring and developing the Property: BGA was thus Western's financier for the purchase of the Property from the Debtor. The Nachamie Firm represented BGA and Western as joint defendants and/or plaintiffs in connection with certain litigation which is pertinent to the proceedings currently before the Court, as explained more fully below.

As the closing date drew on, it became apparent that Western simply did not have $950,000 to pay the Debtor by the designated closing date. Therefore, on June 28, 2001, Western and the Debtor entered into an amendment to their prior agreement (the "Amended Agreement"), which Judge Duberstein later approved by Order dated July 3, 2001 (the "Second Sale Approval Order"). The Amended Agreement provided that the $950,000 owed from Western to the Debtor would be paid in installments: (1) an initial installment of $300,000, which was paid on July 10, 2001; (2) the balance of $650,000, to be paid on or before 90 days after the payment of the first installment (the "Second Installment").

Furthermore, the Amended Agreement required a deed-in-lieu-of-foreclosure ("DILF"), to be held in escrow in anticipation of a possible default by Western of its obligation to pay the Second Installment. The DILF could be assigned either to (A) any entity that Western directed, or (B) to any entity making a payment towards the Second Installment "in writing."

The Amended Agreement also provided that the Debtor's obligation to pay the Second Installment balance of $650,000 must be collateralized by a confession of judgment, executed by both Western and the entity that ultimately took title to the Property as trustee for the benefit of Western.[1] Chief Roberts (on behalf of Western) executed a promissory note (the "Note") and a confession of judgment (the "Confession of Judgment"), both in favor of the Debtor. It was

---

[1] This trust arrangement was apparently required in order for Western to be exempt from paying local taxes on the Property, should it ever be federally acknowledged as an Indian tribe.

apparently the parties' intent that the Confession of Judgment would give the Debtor a lien on the Property, as security for Western's obligation to pay the Second Installment. The Note was guaranteed by Bernard Hujda, a member of BGA.  (Mr. Hujda and the WMTN Trust also executed similar confessions of judgment in favor of the Debtor).

The Second Installment was to be paid by October 16, 2001. Before that date, Mr. Nachamie was advised that Mr. Hujda would be the one furnishing most of the money needed in order to pay the Second Installment. As security for this payment, the Debtor assigned the Confession of Judgment to Mr. Hujda. On October 16, 2001, the Second Installment was paid, and title to the Property was transferred to the WMTN Trust for the benefit of Western.

On July 3, 2002, the Debtor commenced an adversary proceeding against Western, BGA, and Ulster County over tax-related matters. Western filed a cross-claim against Ulster County, seeking Judge Duberstein to confer upon Western formal, federal recognition as an Indian tribe. Judge Duberstein declined to grant this relief for want of subject-matter jurisdiction under 28 U.S.C. § 1334. BGA and Western unsuccessfully appealed. [2] Moreover, in 2006, and again in 2008, Western and BGA sued Ulster County in the U.S. District Court for the Northern District of New York (the "NDNY District Court"), seeking, among other things, a declaratory judgment that Western was an Indian tribe under federal law. The NDNY District Court declined to grant this relief both times. The Nachamie Firm, by Mr. Nachamie, represented both Western and BGA as joint defendants/plaintiffs in connection with this litigation.

This bankruptcy case was closed on January 18, 2006. On May 30, 2006, this case was re-opened and re-assigned to the undersigned. This case was closed again on March 20, 2008.

---

[2] Much of the litigation between Western and Ulster County stems from an agreement between those parties whereby Western would make annual payments to Ulster County, with respect to the Property, that were dramatically less than the usual property-tax payments would have been. However, Western's privilege to make these discounted payments was contingent upon Western attaining formal, federal recognition as an Indian tribe.

Around January 20, 2010, the Nachamie Firm moved the NDNY District Court for permission to withdraw as counsel for Western and BGA in connection with the 2008 litigation against Ulster County, citing $127,000 in mounting, unpaid legal fees. In order to prevent the withdrawal of the Nachamie Firm, on or around February 2, 2010, BGA (through one of its managing members, Mr. Bernie Wiczer), Mr. Hujda (on his own behalf), and the Nachamie Firm entered into an agreement (the "Fee Agreement") whereby Mr. Hujda would assign the Confession of Judgment to the Nachamie Firm for the purpose of securing payment of the Nachamie Firm's legal fees. The parties apparently contemplated that, if the fees were unpaid, then the Nachamie Firm could execute upon the Confession of Judgment and thereby foreclose on the Property. The net proceeds of sale would first go to paying the Nachamie Firm's fees, after which they would be distributed to other interested parties as appropriate. The basic substance of the Fee Agreement was explained in the presence of Chief Roberts at a hearing before U.S. Magistrate Judge Randolph Treece on February 2, 2010.

In or around October of 2010, the Nachamie Firm began attempting to foreclose on the Property, as contemplated in the Fee Agreement. A foreclosure sale (the "Foreclosure Sale") was initially scheduled for April 28, 2011. However, on April 12, 2011, Western and the WMTN Trust commenced a proceeding in New York state court seeking a temporary restraining order ("TRO") and permanent injunction against the Foreclosure Sale (the "2011 Litigation"). Justice Christopher Cahill initially granted the TRO, but ultimately denied a preliminary injunction by Order dated August 8, 2011. The Foreclosure Sale was rescheduled for March 15, 2012.

Meanwhile, on November 1, 2011, the Nachamie Firm assigned the Confession of Judgment to an entity of which it was the sole member, Ulster Acquisitions, LLC.

On March 9, 2012, a few days before the Foreclosure Sale was slated to occur, Western filed a petition for relief under Chapter 11 of the U.S. Bankruptcy Code (the "First Western Bankruptcy") with the U.S. Bankruptcy Court for the Northern District of Illinois (the "Illinois Bankruptcy Court"). This filing automatically stayed the Foreclosure Sale pursuant to 11 U.S.C. § 362(a). The Illinois Bankruptcy Court dismissed the First Western Bankruptcy by Order dated June 12, 2012, on motion of the Office of the United States Trustee. Meanwhile, the Foreclosure Sale was rescheduled again, this time for September 5, 2012.

On August 29, 2012, Western filed another bankruptcy petition (the "Second Western Bankruptcy") in the U.S. Bankruptcy Court for the Northern District of New York (the "NDNY Bankruptcy Court"). This again stayed the Foreclosure Sale under 11 U.S.C. § 362(a). The NDNY Bankruptcy Court dismissed the Second Western Bankruptcy on October 10, 2012, for various reasons, including the fact that Western was not represented in the NDNY Bankruptcy Court by a licensed attorney. The dismissal was with prejudice to the filing, by Western, of another bankruptcy petition for 180 days from the entry of that Order.

By a *pro se* complaint on August 20, 2012, Chief Roberts, Mr. Posr, and one Barbara Roberts (but not Western itself) sued the Debtor, Mr. Nachamie, and other parties in New York Supreme Court, Albany County, index no. 4673-12 (the "Albany Litigation"). Mr. Posr was apparently the "attorney" acting on behalf of the other named plaintiffs. The Albany Litigation complaint sought various forms of relief, including an injunction against the Foreclosure Sale.[3]

On October 25, 2012, Western (through Mr. Posr) filed in this Court a motion to reopen this closed bankruptcy case (the "First Motion to Reopen") for the purpose of obtaining various forms of relief, including: (1) Holding certain parties—including Mr. Nachamie, Mr. Hujda, the

---

[3] Ultimately, the Albany Litigation was transferred to the Supreme Court of Ulster County, New York. Before the transfer, Mr. Nachamie filed a motion to dismiss the Albany Litigation, which has not been opposed, and as to which Mr. Nachamie represents that the time to file opposition has passed.

Debtor, Mr. Bachar, Kera, Ingber, and others (the "Alleged Contemnors")—in contempt for their roles in the creation and assignment of the Confession of Judgment; (2) obtaining an Order both extinguishing any encumbrances on the Property arising before October 16, 2001 and enjoining the Foreclosure Sale; (3) compelling certain discovery; (4) a finding of malpractice, fraud, and related wrongs against Mr. Nachamie and the Nachamie Firm.

The First Motion to Reopen was heard on November 27, 2012 (the "November 27 Hearing"). The Nachamie Firm, Kera, Mr. Graubard, and Ulster County appeared by counsel. Chief Roberts and Mr. Posr appeared for Western. This Court, for the reasons stated at the November 27 Hearing and set forth below, denied the First Motion to Reopen, and an Order to that effect was entered on December 4, 2012 (the "Denial Order").

Undeterred, Western filed another motion through Mr. Posr as "Assistant Attorney General," which is the motion currently before the Court (the "Second Motion to Reopen"). The Second Motion to Reopen seeks an order vacating, amending, and/or reversing the Denial Order so that the case will be reopened, and the relief sought by Western in the First Motion to Reopen can be granted. The Second Motion to Reopen also seeks, *inter alia*, a declaratory judgment by this Court that Western is a sovereign Indian tribe. Relatedly, Western asks for a declaration that, as an Indian tribe and sovereign nation, Western has the prerogative to appoint anyone it wants to represent it before this Court, even non-attorney Posr.

The Second Motion to Reopen was heard on January 29, 2013 (the "January 29 Hearing"), where the same parties appeared as at the November 27 Hearing. At the January 29 Hearing, this Court indicated that it would deny the Second Motion to Reopen to the extent that it requested either (1) a declaratory judgment recognizing Western as an Indian tribe, or (2) permission for Mr. Posr to act as attorney for Western. The Court also indicated that the

remainder of the Second Motion to Reopen would be taken under advisement. This Memorandum Decision and Order finally and fully disposes of the Second Motion to Reopen, which, for the reasons discussed *infra*, is DENIED in all respects.[4]

### Discussion

Western has made before this Court many of the same arguments that it (together with Mr. Poser, Chief Roberts, and others) has made before other courts. As may be pertinent to this Memorandum, they can be summarized as follows:

(1). The Alleged Contemnors violated the language in Judge Duberstein's First Sale Approval Order providing that the closing and consummation of Western's agreements with the Debtor and Ulster County would "enable" the sellers to transfer the Property to Western "free and clear of all title defects, liens, charges, and encumbrances." Western interprets this Order as forbidding the creation of the Confession of Judgment to the extent it operates as a lien against the Property, because this creates a "lien" and an "encumbrance," and therefore "disables" the "free and clear" transfer to Western. Therefore, the Alleged Contemnors should be punished for contempt. Moreover, since any lien represented by the Confession of Judgment was contemptuously created, it is a nullity, and the Foreclosure Sale initiated pursuant thereto ought to be enjoined. Relatedly, Western also wants a finding of malpractice and other wrongs against Mr. Nachamie and others, because they orchestrated this whole "scheme" to "steal" the Property out from underneath Western.

---

[4] Meanwhile, the Foreclosure Sale was rescheduled again for February 11, 2013. Western moved before Justice Cahill, by order to show cause, for an emergency TRO enjoining the Foreclosure sale. On February 11, 2013, Justice Cahill denied Western's order to show cause. Later that same day, Western filed in this Court what was styled as an emergency ex parte order to show cause, which asked for an emergency temporary restraining order enjoining the Foreclosure Sale (the "Emergency TRO Request"). This Court denied the Emergency TRO Request after a hearing held on February 19, 2013. The Nachamie Firm informed this Court that the Foreclosure Sale took place on February 11, 2013. Ulster Acquisitions acquired the Property.

(2). The assignment of the Confession of Judgment by the Debtor to Mr. Hujda also violated the Amended Agreement, which provided that the DILF could be assigned either to (A) any entity as Western directed or (B) to an entity making a payment towards the Second Installment in writing. Western mistakenly believes that this provision also applies to restrict the assignability of the Confession of Judgment, so Western argues that Mr. Hujda meets neither of these criteria, and therefore the Confession of Judgment could not rightly be assigned to him.

The reasons the Court denied the First Motion to Reopen are, in sum, as follows:

Western obviously feels that it has been defrauded. However, Western misunderstands the transaction underlying its purchase of the Property. Western obliged itself to pay the Second Installment through the Note, and it promised security for the Note via the Confession of Judgment (as opposed to a consensual mortgage). Once Western gave the Debtor the Confession of Judgment, it seems apparent that the Confession of Judgment, along with whatever rights it conferred (if any), was the Debtor's to assign to anyone it saw fit, without input from Western— just as a mortgagee may generally assign a mortgage without input from the mortgagor.

Moreover, in order to be held in contempt, a party must disobey a clear and unequivocal court order. *See In re Lucre Management Group, LLC*, 365 F.3d 874, 875 (10th Cir. 2004). The First Sale Approval Order did not "clearly and unequivocally" forbid the creation of any liens to secure Western's obligation to pay the Second Installment; it merely "enabled" the "free and clear" transfer of the Property. Indeed, the Amended Agreement expressly required the creation of the Confessions of Judgment to secure Western's obligation to pay the Second Installment.

Moreover, Western is incorrect to argue that the Amended Agreement permitted assignment of the Confession of Judgment only to an entity as Western directed or to an entity

making a payment on the Second Installment "in writing"; the Amended Agreement did contain

such language, but it only referred to the DILF, not to the Confession of Judgment.

Apparently, the parties to the sale of the Property to Western contemplated that Western

would execute the Note and Confessions of Judgment so as to give rise to an obligation to pay

the Second Installment, which was to be secured by the Confession of Judgment, operating as a

lien. The debt and "security interest" were ultimately assigned to other entities.

There is nothing unjust, and there is no extreme hardship, inherent in permitting the

Nachamie Firm or any other party to enforce whatever rights such party may have under the law

against Western and the Property. The state courts, in light of their denial of the relief that

Western seeks, apparently felt that the Note and Confessions of Judgment gave rise to a

legitimate secured debt obligation. Western never appealed any of the state court orders, and it is

worth noting that this Court is not an appellate forum for state court decisions. Therefore,

Western's core substantive contentions are without merit.

11 U.S.C. § 350(b) provides that a "case may be reopened in the court in which such case

was closed to administer assets, to accord relief to the debtor, or for other cause." The only prong

that might possibly apply here is "other cause," since there are no assets left to administer, and

since Western wants the case reopened to "accord relief" to itself, not the Debtor.

Generally, the determination of whether "other cause" exists to reopen the case is left to

the discretion of the Court, based on the facts of each case. *In re Endlich*, 47 B.R. 802, 804, fn. 3

(Bankr. E.D.N.Y. 1985). The longer the case has been closed, the more compelling is the

justification needed in order to warrant reopening the case. *See Mid-City Bank, et. al. v. Skyline

Woods Homeowners' Assoc., etc. al. (In re Skyline Woods Country Club, LLC)*, 431 B.R. 830,

835 (8th Cir. BAP 2010) (*hereinafter Skyline Woods*). This case was closed for the last time on

March 20, 2008, over 4 1/2 years ago. Moreover, the Debtor's Chapter 11 plan was confirmed on April 21, 2005, over 7 1/2 years ago. Thus, Western bore a heavy burden of persuasion in seeking to reopen the case. *See id.*

The Court may deny a motion to reopen a case where doing so would be futile, or would serve no purpose. *See Dworsky v. Canal Street LP (In re Canal Street L.P.)*, 269 B.R. 375, 381-383 (8th Cir. BAP 2001). Moreover, the Court may deny a motion to reopen where the substantive relief that the movant seeks to obtain by having the case reopened can be obtained in another forum, especially if the movant already sought and failed to obtain the relief in another forum—as Western has done multiple times—which may invoke preclusion doctrines. *See Skyline Woods*, 431 B.R. at 835. A motion to reopen may also be denied if reopening would have no effect on the administration of a bankruptcy case, in that creditors could not benefit from it. *See In re Brooks*, 200 F. Supp. 497, 500 (N.D. Ohio 1962)(construing predecessor to § 350(a)).

Here, Western and/or its representatives already sought much of the relief requested herein before many other courts, based upon many of the same arguments advanced here—and were denied. This Court is not an appellate forum for state court decisions. Indeed, a federal court may only "look behind" the judgment of a New York state court when it " was procured by [certain kinds of] fraud or collusion, or where the rendering court lacked jurisdiction." *In re Slater*, 200 B.R. 491, 495 (E.D.N.Y. 1996). Here, no credible argument has been advanced as to why the other courts lacked jurisdiction, or why their orders were obtained by fraud or collusion.

Once a plan is confirmed in a Chapter 11 case, as it was here, the Bankruptcy Court may exercise jurisdiction only as provided in the plan, or as necessary or appropriate to implement the plan. *See Globaleyes Telecom. v. Verizon North, Inc.*, 425 B.R. 481, 497-498 (Bankr. S.D. Ill.

2010); a*ccord CCM Pathfinder Pompano Bay, LLC v. Compass Financial Partners, LLC et. al.*, 396 B.R. 602, 605 (S.D.N.Y. 2008).

The disputes at the heart of Western's various motions are almost entirely between Western and other entities, none of whom is a debtor in any open bankruptcy case. The Debtor's peripheral involvement here is almost an afterthought; much of the force of Western's arguments is directed against Messrs. Nachamie, Wiczer, and Hujda, all non-debtors. The Property left the estate on October 16, 2001, over eleven (11) years predating this Memorandum. Furthermore, this case is closed, meaning that the estate herein has already been fully administered. *See* 11 U.S.C. § 350(a). Thus, whether or not Western obtains any of the various forms of relief that it is seeking, the result cannot possibly have any effect on any estate being administered in bankruptcy.

Thus, Western has presented the Court with nothing "new" that would justify the Court's revisiting its Order denying the First Motion to Reopen, nor has Western shown the kind of "extreme hardship" or injustice required to justify granting relief from that order under Federal Rule 60(b)(6). Therefore, the Court will not revisit its denial of the First Motion to Reopen.

Moreover, even if Western had submitted valid grounds for this Court to grant the Second Motion to Reopen, that motion would still have to be denied; it is a nullity, since Western has never been represented in this Court by a duly-admitted attorney, but only by Mr. Posr—who, by his own admission, is not an attorney admitted to practice in any jurisdiction. An association of individuals like Western simply cannot appear in federal court without being represented by an attorney duly admitted to practice law. *See Rowland v. Calif. Men's Colony, Unit II Men's Advisory Council,* 506 U.S. 194, 202, fn. 5 (1993) *(hereinafter Rowland)*(referring to the issue in the course of interpreting 28 U.S.C. § 1915). *See also Stoddard v. D.C. Public*

*Defender Svc's*, 535 F.Supp.2d 116, 117, fn. 1 (D. D.C. 2008)(citing *U.S. ex. rel. Rockefeller v. Westinghouse Elec. Co.*, 274 F.Supp.2d. 10 (D. D.C. 2003)); *accord Fraass Survival Systems, Inc. v. Absentee Shawnee Econ. Dev. Auth.*, 817 F.Supp. 7 (S.D.N.Y. 1993) (*hereinafter Fraass*)(discussing the wide acceptance of the general rule against non-attorneys representing associations of people in federal court). [5] Moreover, Local Rule 2090-1(c) of this Court provides that "an individual may appear *pro se,*" but makes no similar provision for an *association* of individuals, like Western. Hence, Western may not appear before this Court through Mr. Posr.

Nevertheless, Western relies on *Fraass, supra,* for the contention that, since it is a sovereign Indian nation, it may appoint whomever it wants to represent it, even if that person is not formally admitted to practice law. The *Fraass* Court carved out a narrow exception to the general rule against *pro se* appearance by groups of people—namely, that a federally-acknowledged Indian tribe could appoint even a non-attorney layperson to represent it in federal court, due to its unique status as a partially-sovereign nation. [6]

However, the reasoning in *Fraass* hinges on the notion that the entity seeking to be represented by a non-attorney has attained formal, federal recognition as an Indian tribe. Without such recognition, there is no "partially sovereign" status, and hence no sovereign prerogative to appear in federal court by a non-attorney. *See Unalachtigo Band of the Nanticoke-Lenni Lenape Nation v. State of New Jersey,* 2007 U.S. Dist. LEXIS 93084 at *10-11, (D.N.J. Dec. 17, 2007)(*hereinafter Lenape*)(distinguishing *Fraass*). Western has not attained federal

---

[5] Some courts have recognized exceptions to this rule in isolated incidences. *See Matter of Holliday's Tax Svc's, Inc.*, 417 F.Supp. 182 (E.D.N.Y. 1976)(reversing Bankruptcy Court's refusal to permit sole non-attorney shareholder of a corporation to appear on corporation's behalf). *See also U.S. v. Reeves*, 431 F.2d 1187 (9th Cir. 1970)(permitting non-attorney partner to appear on behalf of partnership). The U.S. Supreme Court had harsh words for these cases, remarking that they "neither follow federal precedent, nor have themselves been followed," and calling them "aberrant cases." *Rowland*, 506 U.S. at 202, fn. 5.

[6] As the Supreme Court has observed, "Indian tribes are distinct, independent political communities, possessing limited attributes of sovereignty. *Santa Clara Pueblo v. Martinez*, 436 U.S. 49 (1978)(internal quotes omitted). Nevertheless, Congress has power "to limit, modify, or eliminate" this sovereignty. *See id.* at 56-57.

acknowledgment as an Indian tribe, despite having sought it multiple times. However, Western asks this Court to remedy this deficiency by issuing a declaratory judgment recognizing Western as an Indian tribe under federal law. However, although Western may have the Court's sympathy, this Court cannot do so.

This Court lacks the subject-matter jurisdiction to grant Western federal acknowledgment as an Indian tribe. The issue raised is simply not "related to" any pending bankruptcy case, nor is Western a debtor in any pending bankruptcy.

In light of the foregoing, the Second Motion to Reopen is DENIED in all respects.

***So ordered.***



**Dated: Central Islip, New York**
**May 14, 2013**

_____
**Dorothy Eisenberg**
**United States Bankruptcy Judge**